Kenton L. STANGER; Dale M. Anderson, as the personal representative of the Estate of Merlin D. Anderson; and Balanced Security Corporation of America, Plaintiffs and Respondents,

v.

SENTINEL SECURITY LIFE INSURANCE COMPANY, Defendant and Appellant.

No. 17757.

Supreme Court of Utah.

Aug. 11, 1983.

Dwight L. King, Salt Lake City, for defendant and appellant.

John P. Ashton and James A. Boevers, Salt Lake City, for plaintiffs and respondents.

HOWE, Justice:

Plaintiffs sued to recover commissions allegedly due them on sales of insurance which they claimed were being wrongfully withheld by defendant Sentinel. A jury returned special verdicts finding that plaintiffs were entitled to their commissions, that defendant had no contractual right to repayment by plaintiffs of certain amounts it had "advanced" them and that defendant had waived and was estopped from requiring repayment. Defendant moved for judgment NOV or for a new trial. The motion was denied and defendant appeals.

On February 15, 1965 plaintiff Merlin D. Anderson, together with two other partners, entered into a "Sales Management Group Agreement" (SMG Contract) with Sentinel. Sentinel had theretofore been selling mostly small "burial plan" policies, but planned an expansion into the sale of large ordinary life insurance policies. Anderson and plaintiff Kenton L. Stanger had previously been successful managers and agents affiliated with Farm Bureau—Country Mutual Life Insurance Co. Stanger signed a separate "General Agent's Contract" (Stanger Contract) with Sentinel on March 1, 1965. Both contracts covered the agents' authority, their territory, and the payment of commissions. Only the SMG Contract contained a provision on the payment of expenses of the Sales Management Group which read as follows:

> The Company may from time to time pay expenses of the Sales Management Group or sub-agents and if such expenses are paid, such practice shall not create a right in Sales Management Group or sub-agent to require such payment and the Company may make agreements from time to time that said advancements may be reimbursable or nonreimbursable and if such arrangements are made they shall not set a precedent.

On March 10, 1965, Stanger received $7,000 from Sentinel and executed a promissory note in that amount, payable in amounts of not less than $100.00 per month. Stanger complained that he did not like the

payment provision, but was told by Sentinel that it needed the note to get the payment passed by the Board. Stanger used the entire amount to develop new insurance business for Sentinel. When Sentinel began withholding monthly installments from Stanger's accrued commissions, Stanger immediately complained because he had been told that the note would not be a debit. Sentinel informed him at that time that if his production was substantial and to Sentinel's satisfaction, the note would not have to be repaid. The withholding of installments from commissions ceased in the fall of that year.

In April of 1965 Stanger signed up as Sentinel's special agent Robert Ipsen, who for the next 17 months received $1,000 per month advances from Sentinel for the development of the Arizona territory. Under the Stanger Contract, the general agent was responsible for any indebtedness arising under contract of all sub-agents under his authority. Sentinel initially withheld $1,000 as a debit against earned monthly commissions from Ipsen's account. When Ipsen complained, on similar grounds as Stanger, that these were not to be reimbursable expenses, the practice was discontinued as against him, but the $17,000 later appeared as a debit item on Stanger's account. Stanger testified, and Sentinel admitted, that at the time these sums were advanced to Ipsen, he was a special agent under Stanger's regional supervision, but not his sub-agent.

In 1966, additional cash flow was required by Stanger to pay expenses and continue the operation of his insurance agency. Stanger negotiated monthly payments of $2,000 with Sentinel through the second year of his contract. These again started to show up as debits on the commission statements. Upon complaint, Stanger was told that this method was necessary to reflect an accounting on the books and that Sentinel considered these sums developmental allowances which had nothing to do with regular advances against commissions. The practice of withholding these amounts was stopped immediately. No further amounts were withheld from Stanger's commissions between late 1965 and 1975.

On January 13, 1969 the SMG Contract was superseded by a Modification Agreement resulting from the transfer of Anderson's two partners to employee status with Sentinel. In that agreement the actual debit balance for the Sales Management Group was established at $93,285.26. Sentinel and the Sales Management Group agreed that there would be no further overwrites earned under the old SMG Contract for business produced after January 1, 1969, and that only overwrites accruing in the future from business produced prior to January 1, 1969 would be applied to liquidate the debit balance on the SMG account.

On March 1, 1969 Stanger and Anderson as co-agents and Sentinel entered into a new General Agent's Contract and Addendum to General Agent's Contract (Anderson-Stanger Contract). The account created as a result of the Anderson-Stanger Contract was denominated "001," whereas Stanger's previous account was "439," and Anderson's under the SMG Contract was "461." Sentinel conceded that under the Modification Agreement the alleged debits of Anderson could have been withheld only from account "461." However, all sums contested in this action were withheld from Stanger and Anderson from the "001" account. Sentinel bases its right to withhold on language contained in each of the Stanger, SMG, and Anderson-Stanger Contracts as follows:

> Any debt due from or charged payable by, the General Agent to the Company, by virtue of this contract or otherwise, shall be a first lien on all commissions and benefits accrued hereunder.

The jury returned special verdicts with damages of $27,016.40 to Stanger and Anderson, or a total of $54,032.80. That amount was intended to be the total of the four items listed in defendants' Exhibit D–73, a letter addressed by Sentinel's accountant to its counsel explaining the items Sentinel had withheld from Stanger's and Anderson's commissions. That letter reads:

March 25, 1981

Dear Dwight:

Per your request, please find below my anaylsis [sic] of the major differences between Mr. Stanger's accounting and mine.

| | |
|---|---|
| $53,745.63 | Credit balances claimed by Mr. Stanger |
| + 106.00 | Net Debit Balances per Sentinel |
| $53,851.63 | Accounting Difference as of 2–28–81 |

1. $ 7,000.00
2. 23,403.95
3. 17,000.00
4. 13,628.85
   $54,032.80

1. The $7,000.00 represents the note executed in 1965.

2. The $23,403.95 represents advances to Mr. Stanger during his 2nd contract year of February 1966 through January 1967.

3. $17,000.00 represents advances to Robert Ipsen as sub-agent of Mr. Stanger during period of June 1965 through February 1967.

4. $13,628.85 represents Merlin Anderson's share of Debit created while partner of Sentinel Sales Management Group.

As is shown these major items account for all but $181.17 of the differences.

Fred G. Cheney

Accountant

As can be seen on the face of the letter, the sum total of items 1–4 through clerical error omitted the contested promissory note in the sum of $7,000.00, which, when included, brings the amount of withholdings to $61,032.80. The amounts set forth in that letter and claimed as debits appeared as subsidies and investments in some of Sentinel's corporate documents. The record also indicates that in 1969 the Sentinel Board of Directors was informed that expenses formerly chargeable to individual agents' accounts were to be treated as company expenses. Sentinel did not adduce any evidence in support of its theory that the monies were advanced under a reimbursable "bridge-plan" which tides new salesmen over until such time as commissions are generated. None of the contracts contained such a provision, and only the SMG Contract provides for Sentinel's unilateral discretion to advance expenses from time to time, and to make them reimbursable or non-reimbursable.

█ In reviewing the special verdicts in favor of the plaintiffs, we will review the evidence in a light most favorable to the findings of the jury, *Williams v. State Farm Ins. Co.,* Utah, 656 P.2d 966 (1982) and uphold them, so long as there is competent evidence to sustain them. *Time Commercial Financing Corp. v. Davis,* Utah, 657 P.2d 234 (1982) and cases therein cited.

Sentinel contends that both Stanger and Anderson were bound by their written agreements as a matter of law, that the agreements were integrations and were intended by the parties to embody all of their agreements. Thus Sentinel assails the admission by the trial court of parol evidence of the intentions of the contracting parties with respect to the various items and amounts Sentinel had withheld. We will examine each of the four items against this contention:

(1) *The $7,000 promissory note.* Stanger testified that soon after he entered into the Stanger Contract on March 1, 1965 he found that the $500 per month which Sentinel agreed to pay him for one year (without any obligation of repayment) to assist in the payment of the expenses of setting up his agency and developing business was inadequate because his agency was larger than most. He met with E. LaVar Tate, president of Sentinel, and requested additional monies. Tate responded that he thought he could work something out. Shortly thereafter, Sentinel mailed Stanger a check for $7,000, which was enclosed with the promissory note which Stanger was requested to execute and return. Stanger did so, but shortly thereafter complained to Tate that he had not anticipated that he would be required to repay the money. Tate replied that he needed the note to get the payment approved by the Board of Directors. Stanger used the funds to further sales production such as secretarial help, office expenses and recruiting salesmen. When the $7,000 appeared as a debit on one of Stanger's monthly commission statements from Sentinel, he again protested to

Tate. Tate reiterated that that was Sentinel's method of accounting but that if Stanger's production was substantial and Sentinel was satisfied with it, the note would not have to be repaid.

To preserve the sanctity of written instruments, the intent of the parties to a written integrated contract should be found within the four corners of that instrument. *Utah Valley Bank v. Tanner,* Utah, 636 P.2d 1060 (1981). The Stanger Contract was silent on the matter of lump sum payments to Stanger such as the $7,000. The contract therefore was not an integration with respect to the $7,000 since it contained no provision that a lump sum of money would be made available by Sentinel nor whether it would have to be repaid. Therefore, the admission of Stanger's testimony regarding Tate's representations and promises did not violate the parol evidence rule as varying the terms of an integrated contract.

> The doctrine of partial integration is that where a written contract is obviously not, or is shown not to be, the complete contract, parol evidence not inconsistent with the writing is admissible to show what the entire contract really was, by supplementing, as distinguished from contradicting, the writing. In such a case parol evidence to prove the part not reduced to writing is admissible, although it is not admissible as to the part reduced to writing.
>
> 30 Am.Jur.2d, Evidence § 1043.

In a somewhat similar fact situation the Supreme Court of Iowa in *Forbes v. Chicago, R.I. & P.R. Co.,* 150 Iowa 177, 129 N.W. 810 (1911) held that where a written contract employing an attorney is silent on the subject, parol evidence is admissible to show who is chargeable with certain expenses in conducting a suit. See also *North American Uranium, Inc. v. Johnston,* 77 Wyo. 332, 316 P.2d 325 (1957).

Nor was there an attempt here to alter or vary the terms of the note. The testimony of Stanger only showed that the parties by a subsequent oral agreement agreed that the note could be discharged in some way other than payment in money. That way was by producing sales in a substantial amount which was satisfactory to Sentinel. Stanger further testified that his sales production was indeed good and fully satisfactory to Sentinel. Sentinel did not claim otherwise. Therefore, there was competent evidence from which the jury could have concluded that Stanger had fully discharged the note.

(2) *The $23,403.95 paid to Stanger during his second contract year.* This amount is the balance which Sentinel claimed was owing from payments of $2,000 which were made to Stanger to assist covering expenses of his agency for the second year of its operation. As with the promissory note, the Stanger Contract was silent on the subject of this item and therefore the contract cannot be considered an integration of the agreement of the parties concerning whether it should be repaid or not. Parol testimony was therefore admissible as to the parties' oral agreement that this amount was not repayable. The evidence was conflicting with Stanger contending that they were not to be repaid because Sentinel had agreed to furnish the funds to stimulate sales production. This was competent evidence upon which the jury could have based their finding of no liability.

(3) *Payments to Robert Ipsen of $17,000.* Sentinel claimed the right to withhold this amount from Stanger's commissions because in the second amendment to the Stanger contract it was provided:

> The general agent shall be responsible for the indebtedness of all agents under his authority which has arisen from said agent's contracts and which have been created while under his authority.

Sentinel urges that under this provision Stanger was liable as a matter of law for the repayment of the $17,000. That argument, however, overlooks the fact that Ipsen's contract with Sentinel was silent regarding the $1,000 per month Ipsen received for the 17 months he was employed. Here again, as was the case with Items 1

and 2, the written contract was not an integration as to this subject. Therefore, whether the $17,000 was agreed to be repayable by Ipsen and thus an "indebtedness" for which Stanger would be liable became a question of fact and parol evidence was admissible. While the evidence was conflicting, Stanger adduced testimony that the president and vice president of Sentinel stated before the first payment was made to Ipsen that it was not repayable because it was intended to assist him in changing employers and to further the development of Sentinel's business in Arizona. There being competent evidence to support the jury's finding on this issue, we will not disturb it. Moreover, there was also testimony that Ipsen was not Stanger's subagent at the time the payments were made and therefore the debiting of Stanger's account would be improper under the Stanger Contract.

■ (4) *$13,628.85, representing Anderson's share of debit created while operating under the SMG Contract.* At the trial the president of Sentinel agreed with Stanger and Anderson that the repayment of this amount was expressly covered by the Modification Agreement of January 13, 1969, and that under the terms thereof only premiums paid on sales of insurance under the SMG Contract prior to 1969 would be used to reduce and eventually eliminate Anderson's debit balance. The $13,628.85 withheld from the "001" account represented, according to the breakdown provided by Sentinel, Anderson's share of debit created while a partner under the SMG Contract. In view of this recognition by Sentinel, the trial court could have ruled as a matter of law that Sentinel's withholding of this amount was improper.

In sum, it was proper to admit parol evidence extrinsic to the Stanger Contract and the evidence so admitted clearly supports the factual findings of the jury that Sentinel had no contractual rights to withhold any of the sums hereinabove referred to from Stanger for the reasons we have given. As to Anderson, Sentinel conceded it was not permitted to charge the "001" account for funds advanced him during the

initial four year period of his relationship with Sentinel. The jury observed the witnesses, heard their testimony, and it was their exclusive province to weigh the evidence in deciding in favor of one side or the other.

We have reviewed Sentinel's contention with respect to the jury instruction on Sentinel's first lien right on all commissions for debts due and the issues of estoppel and waiver. Inasmuch as the jury found, and we have affirmed their finding, that Sentinel had no contractual right to sums withheld from commissions, that finding is dispositive of this appeal and we deem it unnecessary to address those issues.

■ One point, however, remains to be addressed. As noted above, the jury utilized Sentinel's calculation of amounts withheld from commissions to arrive at an award of damages of $27,016.40 to each Anderson and Stanger, based upon the total of $54,032.80 shown in the above letter exhibit. In fact, the correct total was $61,032.80, which would make a total award of $30,516.40 to each of the two plaintiffs. Under Rule 60(a) of the Utah Rules of Civil Procedure, the trial court may correct clerical mistakes in judgments at any time. See also *Bagnall v. Suburbia & Co.*, Utah, 579 P.2d 917 (1978). In explanation of the intent of the identical Federal Rule of Civil Procedure, the comment has been made that "in this broad approach to correctibility under Rule 60(a), it matters little whether an error was made by the court clerk, the jury foreman, counsel, a party, or the judge himself, so long as it is clearly a formal error that should be corrected in the interest of having judgment, order, or other part of the record reflect what was done or intended." Annot., 13 A.L.R. Fed. 794 (1972). The definition of "clerical mistake" thus extends to include the one here discovered. "It is a type of mistake or omission mechanical in nature which is apparent on the record and which does not involve a legal decision or judgment by an attorney." *In Re Merry Queen Transfer Corp.*, 266 F.Supp. 605, 607 (1967). Our instruction to

the district court to correct the incorrect total amount of judgment, where the mistake is clear from the record, reflects no more than what plaintiffs are entitled to under the verdict. Accord *Fay v. Harris,* 64 Ariz. 10, 164 P.2d 860 (1945).

The judgment on the special verdicts is affirmed in all respects. The case is remanded to the trial court for the limited purpose of correcting the amount of damages to reflect an award of $30,516.40 to each of the plaintiffs. Costs awarded to plaintiffs.

HALL, C.J., STEWART and OAKS, JJ., and DAVID SAM, District Judge, concur.

DURHAM, J., does not participate herein.

DAVID SAM, District Judge, sat.