**J. Richard REES, M.D., Plaintiff and Appellee,**

v.

**INTERMOUNTAIN HEALTH CARE, INC., dba McKay–Dee Hospital, Defendant and Appellant.**

No. 890170.

Supreme Court of Utah.

March 26, 1991.

Charles W. Dahlquist, II, Merrill F. Nelson, Salt Lake City, for defendant and appellant.

Ronald E. Nehring, Thomas J. Erbin, Salt Lake City, for plaintiff and appellee.

HALL, Chief Justice:

Defendant Intermountain Health Care ("IHC") appeals a jury verdict in favor of plaintiff for breach of contract by termination of elective heart surgery privileges at McKay–Dee Hospital, one of defendant's facilities in Ogden, Utah. Defendant claims that plaintiff voluntarily waived his elective surgery privileges at an informal peer review meeting and that the jury verdict is not supported by the evidence.

Plaintiff J. Richard Rees, M.D., was granted privileges to perform both emergency and elective cardiac surgery at McKay–Dee Hospital ("McKay–Dee") in 1971. In 1975, Dr. Rees was a member of an ad hoc committee formed for the purpose of conducting a long-term review of the quality of the heart surgery program at the hospital. The committee concluded that two of the three heart surgeons, Dr. Rees and one other surgeon, had excessive complication and mortality rates compared with national standards.

As a result of the review, the hospital imposed a temporary moratorium on heart surgery in 1980, and Dr. Rees agreed to obtain further training at another hospital. Upon completion of the additional training, Dr. Rees returned to McKay–Dee and resumed emergency and elective heart surgery.

In 1982, the ad hoc committee again became concerned with Dr. Rees's high complication and mortality rates for cardiac surgery. Statistics showed that between 1976 and 1981, among Dr. Rees's patients, nineteen out of sixty-three died, resulting in a 30.16 mortality rate. Consequently, the hospital was notified that its only certified perfusionist and the anesthesiologists would no longer work with Dr. Rees.

On September 8, 1982, the hospital's internal affairs committee met at Dr. Rees's request to review his position with regard to elective heart surgery at the hospital. The committee presented a number of alternatives to Dr. Rees, including his temporarily assisting another cardiac surgeon. Dr. Rees, with counsel present, stated that he would consider the alternatives.

No further action was taken until February 10, 1983, when the ad hoc heart review committee met to discuss the risk-based statistics. Dr. Rees was present with counsel when his record was reviewed and he was presented with an ultimatum to terminate his elective cardiac surgery informally or it would be done formally through due process procedures contained in the hospital bylaws. Dr. Rees was given one week to submit his written decision.

Dr. Rees did not respond within the prescribed one-week period, but the matter was not pursued until the middle of April, when Dr. Rees's counsel phoned the hospital administrator, requested a meeting, and stated that he was ready to "work something out" informally. The apparent reason for the delay in responding to the ultimatum was that Dr. Rees was pursuing a job opportunity in Lander, Wyoming, and did not want to disclose his loss of elective surgery privileges in the application process.

On April 27, 1983, the requested meeting was held. Those present included Dr. Rees; H. Gary Pehrson, hospital administrator; Richard White, M.D., president of the medical staff; William Daines, M.D., medical director; and Richard Alder, M.D., chief of the surgery department. The purpose of the meeting was to specify the types of surgery Dr. Rees would be allowed to perform. He was informed that he could continue to perform emergency cardiac surgery and procedures involving the great vessels of the chest but that he

was not to perform elective cardiac surgery.

Dr. Rees apparently neither verbally agreed nor objected to the limitation of his practice at the meeting. IHC offered evidence at trial that all four of its representatives assumed or were under the impression that Dr. Rees's elective cardiac surgery privileges had been voluntarily relinquished.

Dr. Rees did not dispute his limitation of privileges until June 23, 1983, almost two months after the meeting, apparently after the job opportunity in Lander, Wyoming, did not materialize. When he asserted the right to perform elective surgeries, he was informed that those privileges had been relinquished.

Dr. Rees subsequently commenced this action, claiming that his right to perform elective cardiac surgery was revoked without due process. He filed a motion for preliminary injunction to enjoin the hospital from refusing his exercise of elective surgery privileges. McKay–Dee filed two separate motions for summary judgment: first, claiming immunity from civil suit arising out of the peer review process under the bylaws of the corporation and under the doctrine of equitable estoppel, and second, claiming immunity based solely upon statute. All motions were denied, and the matter went to trial.

On January 31, 1989, a jury trial began wherein the jury rendered a special verdict in favor of Dr. Rees. The jury found that he did not voluntarily relinquish his elective surgery privileges and that he was damaged in the amount of $150,000. The trial court entered judgment on the verdict and ordered that Dr. Rees be reinstated to his former full privilege status.

McKay–Dee presents four issues on appeal: (1) whether the jury verdict in favor of Dr. Rees is supported by the evidence; (2) whether the trial court erred in ruling that Dr. Rees is not equitably estopped to deny that he voluntarily relinquished his elective heart surgery privileges; (3) whether the trial court erred in ruling that McKay–Dee is not immune from liability arising out of the peer review process; and (4) whether the jury award of $150,000 is supported by the law and the evidence.

## I. SUFFICIENCY OF THE EVIDENCE

■ IHC first claims that the jury verdict was not supported by the evidence. When reviewing jury verdicts, we view the evidence in a light most favorable to the findings of the jury and uphold the verdict so long as there is competent evidence to sustain it.[1]

■ In the instant case, the facts are essentially undisputed. The focal point is the April 27, 1983 meeting. IHC claims that Dr. Rees voluntarily terminated his elective cardiac surgery privileges at the meeting. In contrast, Dr. Rees claims that the sole purpose for the meeting was to ascertain which surgical procedures he could undertake without provoking the hospital administration, not to voluntarily terminate his privileges or waive his due process rights. The jury verdict, in essence, came down to a question of credibility.

It is apparent from the record that IHC's representatives assumed or were under the impression that Dr. Rees had voluntarily terminated his elective cardiac surgery privileges. Affidavits and answers to interrogatories filed before trial unequivocally stated that Dr. Rees had voluntary terminated his privileges. At trial, however, the testimony of the IHC representatives was much more guarded.

Mr. Pehrson testified as follows:

Q Now, Doctor, in March of 1986, I took your deposition. And when I took your deposition, sir, you testified at that point that neither you nor Dr. White nor Dr. Alder ever heard Dr. Rees say that he was giving up his privileges at that meeting, isn't that right?

A Yes.

---

1. *See, e.g., Stanger v. Sentinel Sec. Life Ins.,* 669 P.2d 1201, 1204 (Utah 1983); *Time Commercial Financing Corp. v. Davis,* 657 P.2d 234, 236 (Utah 1982); *Dairyland Ins. v. Holder,* 641 P.2d 136, 138 (Utah 1982).

. . . .

Q So at some point all of you at the meeting knew that you were operating under what was at most an assumption that Dr. Rees had given up his privileges, right?

A Right.

Q And despite having changed the position from one of certainty to assumption, you still didn't offer him a fair hearing, did you?

A No.

Dr. White testified as follows:

Q Now, Doctor, the issue of voluntary relinquishment never came up at the April 27th meeting, did it?

A I suspect these words weren't used, no.

Q No, they weren't used. And you assumed that despite the fact it wasn't talked about, and despite the fact that Dr. Rees didn't say he was giving up his privileges, that you nevertheless could assume it, right?

A Yes, because we presented him with what privileges we felt he should be allowed to continue.

Throughout the preliminary discovery and hearings, Dr. Rees consistently maintained that he did not voluntarily relinquish his elective cardiac surgery privileges. He does not dispute the fact, however, that he remained silent during the April 27 meeting despite the fact that the hospital intended to limit his privileges. He maintains that the conclusion of the group was that he would give notice to the hospital if he intended to schedule elective cardiac surgery.

Viewing the evidence in a light most favorable to the jury verdict,[2] we conclude that there is competent evidence to sustain the jury verdict that Dr. Rees did not acquiesce in the limitation of his cardiac surgery privileges and that he was denied due process in contravention of the bylaws of the hospital.[3]

## II. WAIVER AND ESTOPPEL

IHC's next claim is that Dr. Rees voluntarily waived his right to due process and is therefore estopped to assert those rights.

### A. Waiver

We have stated that "[a] waiver is the intentional relinquishment of a known right"[4] and that "[m]ere silence is not a waiver unless there is some duty or obligation to speak."[5] The questions, then, are whether Dr. Rees's actions at the April 27 meeting and thereafter were consistent with waiver and whether he had a duty or obligation to speak or defend himself at the meeting.

Dr. Rees was aware, at the April 27 meeting, that the hospital intended to limit his elective cardiac surgery privileges.[6] He testified as follows:

Q You listened to the proposals of the hospital people in the meeting?

A Yes.

Q Did you understand their proposals to have been made in the context of voluntary relinquishment of your privileges?

---

2. *See, e.g., Stanger,* 669 P.2d at 1204.

3. Dr. Rees's claim is essentially breach of contract, because the bylaws constitute a binding contract between the hospital and physician. *See, e.g., Eidelson v. Archer,* 645 P.2d 171, 178 (Alaska 1982); *Bock v. John C. Lincoln Hosp.,* 145 Ariz. 432, 702 P.2d 253, 258 (Ariz.Ct.App. 1985).

4. *American Sav. & Loan Ass'n v. Blomquist,* 21 Utah 2d 289, 445 P.2d 1, 3 (1968) (quoting *Phoenix Inc. v. Heath,* 90 Utah 187, 61 P.2d 308, 311 (1936)); *see also Plateau Mining Co. v. State ex rel. Utah Div. of State Lands,* 802 P.2d 720, 730 (Utah 1990).

5. *Plateau Mining,* 802 P.2d at 730; *see also Dalton v. LeBlanc,* 350 F.2d 95, 98–99 (10th Cir. 1965).

6. On September 8, 1982, the hospital's internal affairs committee presented him with a number of alternatives to performing elective cardiac surgery. On February 10, 1983, the ad hoc heart review committee presented him with an ultimatum to terminate his elective heart surgery informally or face the prospect of formal termination proceedings. In mid-April 1983, Dr. Rees's attorney phoned the hospital administrator, requesting an informal meeting to "work something out."

A   That was requested.

Q   What do you mean?

A   They [said] do you want to give—will you give up your privileges?  Do you want to become an assistant with other surgeons?  Do you want us to go into due process?  A number of different options were given me that day.

Shortly after the April 27 meeting, the hospital administrator, H. Gary Pehrson, wrote a memorandum reviewing the conclusions of the meeting.  The memorandum stated in part: "After discussion it was agreed that Dr. Rees will withdraw from doing elective cardiac surgeries at the McKay–Dee."

On May 5, 1983, Dr. Richard L. Alder, who was also present at the April 27 meeting, wrote a letter to Dr. Rees stating: "Pursuant to our meeting on the 27th of April it is understood that you have withdrawn from doing elective cardiac surgeries at the McKay–Dee Hospital Center."

After receiving the letter from Dr. Alder, Dr. Rees sent a copy of the letter to his attorney, Richard W. Campbell, and contradicted the contents of the letter.  Mr. Campbell wrote a letter dated June 23, 1983, to Mr. Pehrson stating: "Our efforts at resolving this short of confrontation not succeeding, we therefore notify you that Dr. Rees insists on being able to treat his patients with appropriate surgery, including elective cardiac surgery, at McKay–Dee, in accordance with his privileges there."

IHC claims that the trial court improperly instructed the jury with regard to waiver.  Jury instruction No. 9 stated:

A waiver is the intentional relinquishment of a known right.

To waive a right there must be an existing right, benefit, or advantage; knowledge of its existence; and an intention to relinquish it.

The action or conduct of a party waiving a right must unequivocally show an intent to waive or must at least be inconsistent with any other intent.

Jury instruction No. 10 stated:

A waiver of rights may be shown from a totality of the circumstances surrounding the alleged waiver.

To prove a waiver, it must be shown that the party had knowledge of his rights and did something designedly or knowingly to relinquish them.

A waiver may be proved by indirect evidence.  Silence, or failure to act under some circumstances may be sufficient to prove waiver where such silence or failure to act is unequivocal and inconsistent with any other intent.

A waiver may be inferred from a party's acknowledgment of his rights and his subsequent course of conduct.  You may look at the totality of the circumstances, including the background experience and conduct of the party to determine if he made a voluntary waiver of a right.

Certain language contained in the foregoing instruction patterns that found in *B.R. Woodward Marketing v. Collins Food, Inc.*,[7] wherein the court of appeals stated:

To waive a right, there must be an existing right, benefit, or advantage; knowledge of its existence; and an intention to relinquish it.  The party's actions or conduct must unequivocally evince an intent to waive or must at least be inconsistent with any other intent.[8]

IHC takes the position that requiring waiver to be "unequivocal and inconsistent with any other intent," except in instances of express waiver, constitutes a departure from the standard of proof expressed in *American Savings & Loan Association v. Blomquist*,[9] wherein we stated:

[W]aiver is the *intentional relinquishment* of a known right.  To constitute waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish

7.   754 P.2d 99 (Utah Ct.App.1988).

8.   *Id.* at 101 (citations omitted).

9.   21 Utah 2d 289, 445 P.2d 1 (1968).

it. *It must be distinctly made,* although it may be express or implied.[10]

The foregoing standard of proof requiring that waiver "be distinctly made" is no less exacting than when stated in another way, that the waiver be "unequivocal or at least inconsistent with any other intent." In each instance, the terminology is materially the same.

Webster [11] defines "distinctly" as separately, not confusedly, without a blending or merging of one thing with another, clearly, obviously, unequivocally, decidedly.[12] Likewise, "unequivocal" is defined as leaving no doubt, expressing only one meaning, leading to only one conclusion, clear, unambiguous, carrying no implication of later change or revision, conclusive, and absolute.[13] "Inconsistent" is defined as incompatible, incongruous, inharmonious, and (of a person) incoherent or illogical in thought or action.[14]

■ IHC concedes that in instances of express waiver, the expression thereof must be in unequivocal terms and at least inconsistent with any other intent. However, as in the instant case, where mere silence is urged as the basis of waiver, it would appear that there is all the more reason to apply the identical standard. This is to be seen in that oral or written expressions of waiver present by far the best evidence with which to assess the intent of a party. In distinct contrast, mere silence offers little illumination on the issue of intent. Hence, it is necessary that the circumstances and the quantity and quality of the silence be such as demonstrate a clear, unambiguous, unequivocal intent to waive a known right.

■ We therefore conclude that the jury was properly instructed as to the relevant law of waiver and was free to find as a matter of fact that the totality of the circumstances did not show waiver. Dr. Rees presented evidence that the atmosphere of the April 27 meeting was adversarial. He presented evidence that he took immediate action upon receiving Dr. Alder's letter. Dr. Alder's letter itself, by its very nature, indicates that there was some uncertainty about the final conclusion of the meeting. The jury was well within its purview in finding that Dr. Rees's actions and those of McKay–Dee's administration belie IHC's claim that he voluntarily waived his elective cardiac surgery privileges by remaining silent at the April 27 meeting.

■ When it became obvious to Dr. Rees that he was not going to be able to negotiate his continued elective cardiac surgery privileges, he was under no duty to object or argue with the administrative personnel who were limiting his privileges. Every physician at the hospital has the right to perform those functions for which he or she is accredited under the contract or by-laws. Only when those privileges are taken away by due process or intentionally relinquished can a hospital limit privileges. Where due process is a contractual right, an employer cannot assume, by mere silence alone, that another party has voluntarily relinquished due process rights when no objection is made to the employer's limitation of those rights.

### B. *Estoppel*

■ IHC's related claim is that Dr. Rees's silence led it to believe that he had voluntarily relinquished his due process rights by remaining silent during the meeting and is therefore estopped to claim that his rights were denied. Dr. Rees claims that IHC failed to present the estoppel theory to the jury and therefore is prohibited from raising it for the first time on appeal.

Although IHC argues the theory of estoppel on appeal, it did not present that theory to the jury in the trial court. We have stated, "With limited exceptions, the

---

**10.** *Id.,* 445 P.2d at 3 (citing *Phoenix Ins. v. Heath,* 90 Utah 187, 61 P.2d 308, 311–12 (1936) (citation omitted)) (emphasis added).

**11.** *Webster's New Third International Dictionary* (14th ed. 1961).

**12.** *Id.* at 695.

**13.** *Id.* at 2494.

**14.** *Id.* at 1144.

practice of this court has been to decline consideration of issues raised for the first time on appeal." [15]  IHC claims that where the facts are undisputed, the court may rule on equitable estoppel as a matter of law, thus avoiding the necessity to present the matter to the jury.

IHC's contention is flawed because it is based upon an assumption that Dr. Rees did not dispute whether he had acquiesced in the limitation of his medical privileges. On the contrary, Dr. Rees's acquiescence, or the lack thereof, was a disputed issue of fact, duly ruled upon by the jury in the context of waiver.

We decline to address the issue of estoppel raised for the first time on appeal.

### III.  IMMUNITY

IHC claims that it is immune from suit under two theories.  First, IHC bases its immunity upon the bylaws adopted by the hospital and agreed to by Dr. Rees.  Second, IHC asserts immunity pursuant to Utah statute.  Both immunity based upon the bylaws and immunity based upon statute were submitted to the trial court in two separate motions for summary judgment, and both were denied.

### A.  Bylaws

██  The bylaws of the hospital are, in essence, a contract between the hospital and the physician.  The hospital is required by statute to promulgate certain procedures for the management and quality assurance of its personnel rendering health care.[16]  Bylaws are the means by which a hospital complies with the statutory management requirements.  Hospitals generally will not grant a doctor privileges at the hospital until the doctor agrees to abide by the bylaws of the hospital.

The bylaws of McKay–Dee Hospital require that the physician agree to "participate in the peer review process" and "submit his professional performance to critical review."  In connection with the peer review process, IHC claims that it is immune

from suit under article XVI, section 1.A.1., which states:

Section 1.  CONDITIONS TO APPLICATION FOR, OR EXERCISE OF, CLINICAL PRIVILEGES

A.  The following shall be express conditions to any practitioner's application for, or exercise of, clinical privileges at this hospital:

1.  That any act, communication, report, recommendation or disclosure, with respect to any such practitioner, performed or made in good faith and without malice and at the request of an authorized representative of this or any other health care facility, for the purpose of achieving and maintaining quality patient care in this or any other health care facility, shall be privileged to the fullest extent permitted by law.

. . . .

6.  That the consents, authorizations, releases, rights, privileges and immunities provided by Article VI of these Bylaws for the protection of this hospital's practitioners, other appropriate hospital officials and personnel and third parties, in connection with applications for initial appointment shall also be fully applicable to the activities and procedures covered by this Article XVI.

Article VI, section 2.C.(3)–(4) states:

C.  Any applicant in applying does thereby:

. . . .

(3) release from liability all hospital and Medical Staff representatives for their acts performed in good faith and without malice in evaluating his application.

(4) release from liability all institutions, organizations, and individuals who furnish information in good faith and without malice to the hospital and Medical Staff representatives concerning his competence, qualifications and ethical behavior.

The bylaws indicate that the immunity provisions are meant to protect the hospital

---

**15.**  *Espinal v. Salt Lake City Bd. of Educ.,* 797 P.2d 412, 413 (Utah 1990).

**16.**  *See* Utah Code Ann. §§ 58–12–27, 58–12–43(1)–(2) (1983).

and its personnel from defamation suits or suits arising from actions taken in the peer review process itself. Dr. Rees's suit against the hospital is not a defamation suit, and the April 27 meeting was not a peer review hearing. The extensive procedures for peer review hearings are specifically designated in articles XIII and IX of the hospital bylaws. The April 27 meeting was not a peer review hearing within the description and designation contained in the bylaws.

The trial court was correct in finding, as a matter of law, that the immunity provisions in the hospital bylaws did not prevent Dr. Rees's suit for denial of due process in contravention of the bylaws.

### B. Statutory Immunity

IHC's next claim is that it is immune from suit pursuant to Utah Code Ann. § 58-12-25 (Supp.1983), which provides:

Physicians appointed and serving upon utilization review committees, established to determine if hospitals and long-term care facilities are being properly utilized, physicians appointed and serving upon committees established to evaluate and improve the quality of medical care or to determine whether medical care which has been rendered was necessary, appropriate and properly performed, or that the cost of such medical care was reasonable, including committees functioning ... as a professional standards review organization ... or any similar committee established by any hospital, the Utah state medical association, or one of its component medical societies, to evaluate or review the diagnosis or treatment of, or the performance of medical or hospital services to, patients within this state, and physicians or other medical or hospital services to, patients within this state, and physicians or other persons furnishing information to those committees as required by law, voluntarily, or upon official request, shall be immune from liability with respect to deci-

sions or determinations made or furnished if made or furnished in good faith and without malice; provided that nothing in this act shall be construed to relieve any physician from liability he may incur from professional care and treatment of any patient.

IHC would have the court interpret this section to mean that any act taken by the hospital even remotely related to a peer review process, including the denial of formal peer review proceedings specified in a contract, is protected by statutory immunity. IHC claims that every entity involved in the peer review process, including the hospital, is protected by the statutory immunity contained Utah Code Ann. § 58-12-43(8) (Supp.1985), which states:

(8) An individual who is a member of a hospital administration, board, committee, department, medical staff, or professional organization of health care providers as defined in Subsection 78-14-3(1) is immune from liability arising from participation in a review of a health care provider's professional ethics, medical competence, moral turpitude, or substance abuse.

Utah Code Ann. § 78-14-3(1) (1953) defines "health care provider" as follows:

(1) "Health care provider" includes any person, partnership, association, corporation or other facility or institution who causes to be rendered or who renders health care or professional services as a hospital, physician, ... and others rendering similar care and services relating to or arising out of the health needs of persons or groups of persons, and officers, employees, or agents of any of the above acting in the course and scope of their employment.[17]

While it is clear that the definition of "health care provider" includes a "corporation or other facility" or hospital, the immunity statutes mention protection only for individuals. In addition, IHC fails to demonstrate the relevance of the above immunity statutes. Subsection (8) of section 58-

---

**17.** The current definition of "health care provider" under Utah Code Ann. § 78-14-3(9) (Supp. 1990) is essentially the same.

12–43 did not become effective until July 1, 1985.[18] Since the statute does not expressly state that it is to operate retroactively, it does not affect liabilities that arose in 1983.[19] In any event, the plain language of the statutes indicates that their purpose is to protect health care providers who furnish information regarding the quality of health care rendered by any individual or facility. Dr. Rees's suit against IHC does not arise out of the fact that doctors and hospital administration provided adverse information regarding his competence; rather, his cause of action arises because the hospital terminated his privileges without a contractual due process hearing.

▮ Although the trial court correctly denied summary judgment on the basis of statutory immunity because it determined that the immunity statute applied only to individuals, not hospitals, we also affirm the summary judgment on the basis that the immunity statutes are inapplicable to the instant case.[20]

## IV. DAMAGES AWARD

IHC presents two issues regarding damages. First, IHC argues that because Dr. Rees's privileges would have been terminated anyway had due process been instituted, his damages were only nominal. Second, IHC claims that the jury award was unreasonable in light of the evidence of mitigation.

### A. Nominal Damages

▮ The trial court refused to allow IHC's expert witnesses to testify regarding what might have been expected if there had been a due process hearing, because IHC failed to lay a proper foundation for

its experts to express an opinion. In *Whitehead v. American Motors Sales Corp.*,[21] we stated: "In reviewing the question of admissibility of evidence at trial, deference is given to the trial court's advantageous position; thus, that court's rulings regarding admissibility will not be overturned 'unless it clearly appears that the lower court was in error.'"[22] With regard to evidence presented by expert testimony, we have stated: "The trial court is allowed considerable latitude of discretion in the admissibility of expert testimony, and in the absence of a clear showing of abuse, this court will not reverse."[23]

The trial court was correct in disallowing opinion testimony that lacked proper foundation. Because the factual issue of whether Dr. Rees's privileges would have been terminated was not admitted into evidence below, the issue of nominal damages is not properly before us.

### B. Mitigation of Damages

▮ IHC's final claim is that Dr. Rees suffered no damages because he undertook other surgical procedures to supplant his inability to perform the elective cardiac surgery. Dr. Rees's expert, Paul Randle, testified that Dr. Rees averaged eighteen elective cardiac surgeries per year and that over a sixteen-year period, from 1982 to his retirement in 1998, he would have a present value loss of $1,176,856. IHC had the opportunity to vigorously cross-examine Mr. Randle concerning the bases for his assumptions.

IHC presented evidence that Dr. Rees's income actually increased after he was forced to discontinue cardiac surgery. Nevertheless, Dr. Rees stated that despite the fact that he undertook additional proce-

---

**18.** 1985 Utah Laws ch. 179, § 1.

**19.** Utah Code Ann. § 68–3–3 (Supp.1983); *see also Smith v. Cook,* 803 P.2d 788, 792 (Utah 1990).

**20.** We may affirm the ruling of a trial court on any proper grounds. *See State v. Gallegos,* 712 P.2d 207, 209 (Utah 1985) (supreme court may affirm trial court's decision to admit evidence, even though trial court assigned another reason for its ruling); *State v. Bryan,* 709 P.2d 257, 260

(Utah 1985); *Jesperson v. Jesperson,* 610 P.2d 326, 328 (Utah 1980); *Allphin Realty, Inc. v. Sine,* 595 P.2d 860, 861 (Utah 1979).

**21.** 801 P.2d 920 (Utah 1990).

**22.** *Id.* at 3 (quoting *State v. Gray,* 717 P.2d 1313, 1316 (Utah 1986)); *see also Bullock v. Ungricht,* 538 P.2d 190, 192 (Utah 1975).

**23.** *Lamb v. Bangart,* 525 P.2d 602, 607–08 (Utah 1975).

dures to supplant the lost cardiac surgery, he could still have performed eighteen elective cardiac surgeries per year.

We uphold jury verdicts awarding damages so long as there is some rational basis for the award. In *Bastian v. King*,[24] we stated:

> Although an award of damages based only on speculation cannot be upheld, it is generally recognized that some degree of uncertainty in the evidence of damages will not suffice to relieve a defendant from recompensing a wronged plaintiff. As long as there is some rational basis for a damage award, it is the wrongdoer who must assume the risk of some uncertainty.[25]

In *Atkin, Wright & Miles v. Mountain States Telephone & Telegraph*,[26] we stated:

> While the standard for determining the amount of damages is not so exacting as the standard for proving the fact of damages, there still must be evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages.[27]

■■ Where evidence is in conflict in a trial, we assume that the jury believed that evidence which supported its verdict and weighed the evidence as it deemed appropriate. On review, we will not disturb a jury's award of damages unless it is so irrational as to indicate passion, prejudice, disregard of competent evidence, consideration of improper factors, or misunderstanding.[28] The trial court denied IHC's motion to alter or amend the judgment by observing that the damages award was "within the range that reasonable minds could arrive at and is not so speculative or excessive that it should be amended." We agree.

Affirmed.

ZIMMERMAN, J., and PAMELA T. GREENWOOD, Court of Appeals Judge, concur.

STEWART, Justice (dissenting):

I dissent.

This is not a contract case concerning breach of a commercial contract to sell some commodity. It is, rather, a case involving considerations of high public interest and duties that run not only to the contracting parties, but also to the public. Even if not true in a technical legal sense, the real parties in interest in this case are patients who may have been and may yet be operated on by a physician who has a mortality rate that is unacceptably high.

## I. WAIVER

IHC argues that the jury was erroneously instructed on the law of waiver. I agree. Instruction No. 9 told the jury that it could not find that Dr. Rees waived his right to "due process" hearings to terminate his right to perform elective cardiovascular surgery unless his conduct "unequivocally" showed an intent to waive or was "inconsistent with any other intent." Instruction No. 10 informed the jury that silence or failure to act could be a waiver only if the import of the silence was "unequivocal and inconsistent with any other intent." These instructions did not allow the jury to find waiver on the basis of all the evidence. Essentially, they made it all but impossible for the jury to find waiver absent an express statement by the plaintiff.

The majority relies on an opinion from the Utah Court of Appeals to affirm the correctness of the jury instructions on waiver. The language used by the court of appeals is based on the opinion of this Court in *Hunter v. Hunter*, 669 P.2d 430, 432 (Utah 1983). *Hunter* involved the failure of a plaintiff to collect unpaid child support payments and presented facts

24. 661 P.2d 953 (Utah 1983).

25. *Id.* at 956 (citations omitted).

26. 709 P.2d 330 (Utah 1985).

27. *Id.* at 336 (citations omitted).

28. *See supra* notes 20–23 and accompanying text.

which are different from this case. An instruction defining waiver by silence or failure to require an act that is "unequivocal and inconsistent with any other intent" may be appropriate in cases like *Hunter* in which mere silence is involved, but in this case, there was much more than mere silence on Dr. Rees's part and hence the instruction was wrong in my view. *Corbin on Contracts* states that the "term 'waiver' has been given various definitions; the fact is that it is used under many varying circumstances. There is no one 'correct' definition; it can not be defined without reference to the kind of circumstances to which it is being related." 3A A. Corbin, *Corbin on Contracts* § 752, (1960).

It is clear from the record that Dr. Rees knew precisely what was at stake at the April 27th meeting. He knew that he would be required to relinquish his privileges voluntarily or opt to go through a formal decertification proceeding. He knew that before he came to the meeting. After the hospital's profusionist and anesthesiologists indicated that they would no longer work with Dr. Rees, and after a careful review of the mortality statistics pertaining to his patients and their risk factors, the hospital's internal affairs committee met *at Dr. Rees's request* to review his position with regard to the right to perform elective heart surgery. The committee, on September 8, 1982, presented various alternatives to him, which Dr. Rees, with his counsel in attendance, stated he would consider. Subsequently, a critical meeting occurred which the majority all but ignores. On February 10, Dr. Rees was told that he had to make an election. Going into that meeting, he knew that the issue to be decided was whether he would voluntarily give up his elective privileges to do cardiovascular surgery or whether the hospital would proceed to formal decertification procedures under the hospital bylaws. The minutes of the February 10th meeting state defendant's position that, because of "the information we [i.e. the hospital and reviewing doctors] have and the obligation to the public, we feel we have a duty to take further action at this point if Dr. Rees does not want to discontinue do-

ing elective open heart surgery. The further action would be to begin due process."

At trial, Dr. Rees testified about the February 10th meeting as follows:

A: [T]here is in this set of minutes a statement that it was decided Dr. Rees and his counsel would be given one week to consider the matter before submitting a decision in writing.

Q: Did you know what the matter was that was to be considered?

A. The matter was whether I was to give up my privileges or not was the implied decision.

Dr. Rees was given a copy of the minutes of that meeting, and those minutes expressly state that he would notify the hospital of his decision in writing within one week. He did not respond. The obvious risk of liability to the hospital and the committee members continued because of his recalcitrant determination to pursue his own interests.

Finally, after an interval of several weeks, Dr. Rees authorized his attorney to contact defendant to schedule a meeting, which was to be held on April 27. At that meeting, IHC's representatives and the other physicians in attendance understood that Dr. Rees had agreed to give up his privileges to do elective cardiovascular surgery, one of the two options he had previously indicated he would decide between. Because no minutes were kept at the April 27th meeting, a letter dated May 5 was sent to Dr. Rees, confirming the understanding reached in the meeting. For six weeks, Dr. Rees did not tell the hospital that he did not agree with the conclusion in the letter or that he would continue to insist on exercising his full privileges. During the interval between May 5 and June 23, Dr. Rees did not request that proceedings be initiated under the bylaws, and he did not attempt to perform any elective surgery. Not until June 23 did he reply, stating that he had not voluntarily relinquished his elective privileges.

Why did Dr. Rees do nothing to contest the understanding that all other persons in attendance at the April 27th meeting

thought had been reached as to what Dr. Rees's election was? The answer is, he did not want to jeopardize his chance of obtaining a position at another hospital in Lander, Wyoming, to do cardiovascular surgery. When that opportunity did not materialize, he finally responded to the May 5th letter. At trial, plaintiff was asked the following question:

Q. And isn't it also true that you decided to do nothing about the letter because you had a pending application at Lander Valley Hospital, [and] *you knew if the hospital started due process, as you indicated, you wouldn't win,* your application would be denied, *and you would also be denied at Lander because of the revocation?*

A. That's true.

(Emphasis added.)

On the issue of waiver, Dr. Rees's admission that he knew he would not win in a "due process" proceeding and that he would be "denied at Lander because of the revocation" clearly reveals Dr. Rees's strategy with respect to the hospital and the whole peer review procedure. Dr. Rees admitted to pursuing a strategy of self-interest by stringing the hospital along. He was not abused by the hospital. If anything, the hospital went too far in bending over backward for him.

To condone Dr. Rees's gamesmanship in matters of life and death does not strike me as good public policy, nor do I believe that it is required by the law. Dr. Rees knew that he had been required to make an election in the February 5th meeting. Dr. Rees also believed that his elective privileges would be withdrawn if formal procedures were instituted against him.

Given all this, I would hold as a matter of law that Dr. Rees waived his elective privileges when he refused to reply to the May 5th letter and ask for proceedings to be initiated. At the very least, the jury should have been allowed to decide the waiver issue on an instruction that allowed it to consider all the inferences that arose from the evidence. In short, the waiver issue should have been decided on the basis of the totality of the circumstances. The jury instruction requiring an "unequivocal" intent and an intent "inconsistent with any other intent" placed upon defendant an improper and almost insurmountable burden of proof.

## II. BYLAWS IMMUNITY

Article XVI(1)(A)(1) of the bylaws provides that "any act, communication, report, recommendation or disclosure ... performed or made in good faith and without malice ... for the purpose of achieving and maintaining quality patient care ... shall be privileged to the fullest extent permitted by law." Subsection (A)(4) provides "[t]hat the acts, communications, reports, recommendations and disclosures referred to in this Article XVI may relate to a practitioner's professional qualifications, clinical conference ... or any other matter that might directly or indirectly have an effect on patient care."

I disagree with the majority's conclusion that IHC is not immune from liability for its acts in this case under its bylaws. The majority concludes that because the April 27th meeting was not a peer review hearing, defendant's actions are not covered by the bylaws. The minutes of the February 5th meeting clearly demonstrate that the entire issue of Dr. Rees's qualifications and privileges was indeed part of a peer review proceeding.

The determination that plaintiff voluntarily relinquished his elective privileges, even if procedurally faulty, was an act performed for the "purpose of achieving and maintaining quality patient care" and was the product of the peer review process. The procedure was a necessary and essential preliminary step to a formal peer review process which could and would have been consummated had plaintiff not been trying to avoid that result while he attempted to obtain a position at another hospital. In my view, IHC's action is covered by the phrase "any other matter that might directly or indirectly have an effect on patient care."

## III. STATUTORY IMMUNITY

Furthermore, because of the statutory immunity which I believe applies to the

# 1082

defendant hospital, plaintiff is not entitled to damages even if he did not voluntarily waive his elective privileges. Although the relevant statutes do not expressly include hospitals in the grant of immunity, such a construction is justified when the overall purpose and structure of the immunity statutes are taken into account. Utah Code Ann. § 58–12–27 (1974) provides that the purpose of the Utah Medical Practice Act is "to protect the public from the practice of medicine by unauthorized and unqualified persons."

Also, Utah Code Ann. § 58–12–25 (Supp. 1983) provides in part:

[P]hysicians appointed and serving upon committees established to evaluate and improve the quality of medical care ... shall be immune from liability with respect to decisions or determinations made or furnished if made or furnished in good faith and without malice....

The intent of the preceding statutes is to encourage those in the best position to improve the delivery of health care services to take steps to do so.[1] By removing the risk of liability from decisions made in good faith, the Legislature also removed a major deterrent to corrective action. Hospitals, through their agents and in conjunction with their medical staffs, must identify quality problems in medical services. Hospitals themselves are required by law to take action to improve the quality of medical care. *See* Utah Code Ann. § 58–12–43(1), (2) (Supp.1983). As in this case, most review actions will be initiated and carried out through the auspices of the hospital.

Given these considerations, it makes little sense to immunize physicians from liability without granting similar immunity to hospitals. The committees on which the physicians serve act for the hospitals. Not immunizing hospitals would substantially undermine the legislative policy of improving health care in the state of Utah. Surely the Legislature did not intend such an anomolous result. The statutes do not expressly exclude hospitals, and the Legislature has subsequently clarified § 58–12–25

by substituting "health care providers" for "physicians," thus expressly extending to hospitals the immunity that only implicitly existed prior to the amendment. *See* Utah Code Ann. § 58–12–25 (1990).

The majority opinion also holds that, even if statutory immunity were extended to hospitals, that immunity would not apply to IHC in this case because the immunity protects only information provided for a peer review group. That conclusion does not reflect the scope of the statutory immunity, in my view. Section 58–12–25 provides that participants in the process of evaluating and improving the quality of medical care "shall be immune from liability with *respect to decisions or determinations made or furnished* if made or furnished in good faith and without malice...." (Emphasis added.) This was not, as the majority argues, a simple failure to fulfill a contractual obligation. Even if plaintiff did not voluntarily relinquish his elective privileges, the determination that he did so was made by defendant in the course of a preliminary peer review proceeding conducted for the purpose of improving the quality of medical care. The issue is whether that determination was made in good faith and without malice. If it was, even if wrong, defendant should not be subject to liability for its determination. There is no doubt that it was made in good faith.

Because of the error in the jury instructions on waiver and because of the immunity granted to defendant both by statute and by its bylaws, I would reverse the judgment and remand for a new trial.

HOWE, A.C.J. concurs in parts I and II of the dissenting opinion of STEWART, J.

DURHAM, J., having disqualified herself, does not participate herein; GREENWOOD, Court of Appeals Judge, sat.

---

**1.** Defendant also relies on Utah Code Ann. § 58–12–43(8). However, subsection (8) was added to § 58–12–43 in a 1985 amendment and therefore does not apply to this case.