DON HOUSTON, M.D., INC., a Utah corporation; and Don Houston, individually, Plaintiffs and Appellants,

v.

INTERMOUNTAIN HEALTH CARE, INC., a Utah corporation; Dixie Medical Center, a branch of Intermountain Health Care, Inc.; Gordon Storrs; Ronald Snow; Bruce Williams; John Does 1 through 6, and individuals, Defendants and Appellees.

No. 930524–CA.

Court of Appeals of Utah.

Feb. 21, 1997.

Michael H. Wray and Paul G. Amann, Amann & Wray, L.C., Salt Lake City, for Plaintiffs and Appellants.

Charles W. Dahlquist and Merrill F. Nelson, Kirton, McConkie & Poelman, Salt Lake City, for Defendants and Appellees.

Before DAVIS, P.J., and GREENWOOD and JACKSON, JJ.

GREENWOOD, Judge:

Appellant Dr. Don Houston challenges the trial court's summary judgment in favor of appellees. The trial court ruled that appellees are entitled to judgment, as a matter of law, because (1) they are immune, both statutorily and by hospital bylaws, from liability because they acted in good faith, and (2) they substantially complied with hospital bylaws in suspending Dr. Houston's surgical privileges. We affirm.

## FACTS [1]

Dr. Houston was a surgeon with full surgical privileges at Dixie Medical Center (the Hospital), in St. George, Utah, commencing in 1978. In March 1982, a peer review committee at the Hospital expressed concerns that Dr. Houston (1) was not providing adequate pre-operative evaluations of patients; (2) would sometimes leave town after performing major surgery, without arranging for qualified people to administer care to his patients; (3) had an unusually high complication rate for his surgeries; and (4) was not attending staff meetings on a regular basis,

as required by the Hospital bylaws. Dr. Houston was informed of these concerns.

Following the death of one of Dr. Houston's gastric bypass patients in February of 1983, the Hospital's surgical committee (the Surgical Committee) again reviewed Dr. Houston's work. As a result of its review, the Surgical Committee requested that Dr. Houston make himself readily available after performing gastric bypass surgery and obtain "a gynecology consult before performing any gynecologic surgery." In addition, the Surgical Committee informed Dr. Houston that a qualified physician, unaffiliated with the Hospital, would further review his gastric bypass and gallbladder surgical practices.

Dr. Swen Swensen, a Clinical Professor of Surgery at the University of Utah Medical Center, performed the independent review. Dr. Swensen's report identified several problems with Dr. Houston's surgical practices, including the following: (1) inadequate pre-operative evaluations and examinations; (2) removal of gallbladders for questionable reasons, and, in some cases, for no apparent reason; and (3) above average complication and mortality rates. Dr. Swensen recommended re-evaluation of Dr. Houston's surgical procedures and cessation of routine and unjustified gallbladder removal. Additionally, Dr. Swensen criticized Dr. Houston's practice of leaving the state shortly after performing surgeries.

On April 25, 1984, the Surgical Committee met to consider Dr. Swensen's recommendations (the April 25 meeting). The minutes of that meeting state:

> The consensus of the committee was that an ad hoc committee of three physicians and the Quality Assurance Director prepare a letter to the surgeon, outlining guidelines, protocols, proctoring, chart review for a specific length of time and consequences stated if the surgeon doesn't conform. This preparation will be completed nine (9) days from this meeting. MOTION BY DR. WINTCH, SECONDED BY DR. STUCKI THAT DATA BE EXTRACTED FROM THE REPORT BY

---

[1]. Because this is an appeal from a summary judgment, we recite the facts in a light most favorable to Dr. Houston, the losing party. *See,*

*e.g., Broadbent v. Board of Educ.,* 910 P.2d 1274, 1277 (Utah App.), *cert. denied,* 917 P.2d 556 (Utah 1996).

DR. SWENSEN, GUIDELINES BE FORMULATED ON PRE–OP WORK–UPS AND POST–OP FOLLOW–UPS, AND THAT THESE BE PRESENTED TO THE SURGEON IN A MEETING TO BE HELD TWELVE (12) DAYS FROM THIS MEETING. . . .

The next day, Dr. Ronald Snow, chair of the Surgical Committee, met with the Hospital's legal counsel, Charles Dahlquist. At that time, Mr. Dahlquist advised Dr. Snow that summarily suspending Dr. Houston's surgical privileges would be appropriate. Accordingly, Dr. Snow notified Dr. Houston that his surgical privileges were suspended. Section 13.81 of the Hospital bylaws provides for summary suspension under the following circumstances:

> Whenever a professional['s] . . . conduct requires that immediate action be taken to protect the life of any patient(s) or to reduce the substantial likelihood of injury or damage to the health or safety of any patient, employee or other person present in the hospital or whenever there are reasonable grounds to believe his conduct requires prompt action for any of such reasons, either the chairman of the Medical Executive Committee or of a department, the Hospital Administrator or his designated representative, the executive committee of either the Medical Staff or the Board, (or an appropriate committee thereof) shall have the authority to summarily suspend the Medical Staff membership status or all or any portion of the clinical privileges of such practitioner.

On May 1, 1984, the Surgical Committee met to consider the summary suspension of Dr. Houston's privileges. The committee decided to restore all of Dr. Houston's privileges except those for gastric bypass and gallbladder surgery, but agreed to restore those privileges after Dr. Houston submitted appropriate protocols for those surgeries.

On May 15, 1984, the Surgical Committee again reviewed Dr. Houston's status. At this time, it elected to have the matter reviewed by three independent physicians, unaffiliated with the Hospital in any way (the Appeal Committee). Dr. Houston received notice on May 30, 1984, that the Appeal Committee

would meet on June 7. After its review, the Appeal Committee sustained the partial suspension of Dr. Houston's privileges.

On June 12, 1984, Dr. Houston submitted a protocol for gallbladder surgery, which the Surgical Committee accepted after some revision, and accordingly, Dr. Houston's gallbladder surgical privileges were restored on June 19, 1984. Dr. Houston never submitted a protocol for gastric bypass surgery, having voluntarily decided to discontinue performing those surgeries.

Subsequently, Dr. Houston sued appellees, claiming, among other things, that they had not complied with the Hospital bylaws in summarily suspending his surgical privileges. Appellees counterclaimed for abuse of process and intentional interference with prospective economic relations. The trial court entered summary judgment in favor of appellees, on the grounds that appellees substantially complied with the Hospital bylaws in suspending Dr. Houston's privileges and that appellees were immune from liability under applicable statutes and bylaws (the 1989 judgment). The counterclaims remained unresolved.

Dr. Houston appealed to the Utah Supreme Court, but that court dismissed the appeal for lack of a final appealable order because of the unresolved counterclaims. Soon thereafter, Dr. Houston filed bankruptcy, and this case was automatically stayed. After the bankruptcy court lifted the stay, the trial court entered an order (the 1993 order) declaring the 1989 judgment "final for purposes of appeal despite the pendency of defendant's unresolved counterclaim because said counterclaim constitutes an unliquidated claim against the plaintiff, the litigation of which has been automatically stayed by reason of plaintiff's voluntary bankruptcy proceeding." Pursuant to this order, Dr. Houston again filed a notice of appeal.

After being transferred to this court, this case was "temporarily remanded for entry of an order clarifying whether the [trial] court intended to certify the summary judgment as final under Rule 54(b) [of the Utah Rules of Civil Procedure]." Subsequently, the trial court entered a new order (the 1995 order),

specifically certifying the 1989 judgment as final under Rule 54(b) of the Utah Rules of Civil Procedure. Dr. Houston did not file a notice of appeal from that order.

## ISSUES

We address the following issues: (1) Does this court have jurisdiction; (2) did the trial court correctly rule that the Hospital bylaws provide appellees immunity from Dr. Houston's suit;[2] and (3) did the trial court correctly rule that appellees had adequately complied with the bylaws?

## STANDARD OF REVIEW

After viewing the facts in a light most favorable to the losing party, we will affirm a grant of summary judgment "only if there is no disputed issue of material fact and the moving party is entitled to judgment as a matter of law. We grant no deference to the trial court's conclusions of law and review them for correctness." *Broadbent v. Board of Educ.,* 910 P.2d 1274, 1277 (Utah App.) (citation omitted), *cert. denied,* 917 P.2d 556 (Utah 1996); *accord Berenda v. Langford,* 914 P.2d 45, 50 (Utah 1996).

## ANALYSIS

### Jurisdiction

■ Appellees argue that the 1989 judgment was not appealable until after the 1995 order and that because Dr. Houston did not file a notice of appeal from the 1995 order, this court does not have jurisdiction to hear

2. Because of our disposition of this issue, we need not address the issue of whether appellees are immune under the immunity statute applicable at the time of Dr. Houston's suspension. *See* Act of Jan. 30, 1976, ch. 4, § 4, 1976 Utah Laws 12–13 (current version at Utah Code Ann. § 58–13–4 (Supp.1996)).

3. In this respect, this case differs from cases where Utah appellate courts have dismissed appeals because a trial court wholly failed to certify a nonfinal judgment under Rule 54(b). For example, in *Shaw,* this court dismissed an appeal because the trial court did not attempt to make a proper Rule 54(b) certification, but instead simply stated that the unresolved claims would be "held in abeyance." *Shaw v. Layton Constr. Co.,* 854 P.2d 1033, 1034 (Utah App.1993).

the appeal. Generally, a judgment is not a final, appealable order if it does not dispose of all the claims in a case, including counterclaims. *E.g., Shaw v. Layton Constr. Co.,* 854 P.2d 1033, 1035 (Utah App.1993). However, nonfinal orders can be appealed if this court grants permission under Rule 5 of the Utah Rules of Appellate Procedure, or if the trial court expressly certifies them as final for purposes of appeal under Rule 54 of the Utah Rules of Civil Procedure. *See, e.g., A.J. Mackay Co. v. Okland Constr. Co.,* 817 P.2d 323, 325 (Utah 1991). Rule 54(b) certifications must comply with the rule's requirements. *See, e.g., Shaw,* 854 P.2d at 1034–36.

■ In the instant case, the trial court clearly intended to certify the 1993 order under Rule 54(b), but failed to incorporate its terminology.[3] Accordingly, we temporarily remanded this case for the trial court to remedy its minor technical error.[4] In response, the trial court issued the 1995 order, which included the appropriate Rule 54(b) terminology to certify this case for appeal. As such, the 1995 order acted as an order nunc pro tunc, relating back to the 1993 order. *Cf. Marshall v. Marshall,* 915 P.2d 508, 513 n. 8 (Utah App.1996) (recognizing propriety of trial court using a "nunc pro tunc order to correct the court's earlier error in not sufficiently stating the grounds justifying the entry of defendant's default").

■ A nunc pro tunc order allows a court to enter an order which correctly reflects a ruling previously made and which, therefore, relates back to that previous ruling. *See*

4. To serve the interests of judicial economy, this court has temporarily remanded cases for limited purposes and with the express understanding that once these purposes are fulfilled, the case will proceed in regular course. *See, e.g., Sandy City v. Brown,* 827 P.2d 953, 954 (Utah App. 1992) (remanding case for appointment of appellate counsel).

As a result of our temporary remand, this case is unlike *Kennedy v. New Era Industries, Inc.,* 600 P.2d 534 (Utah 1979). In *Kennedy,* the Utah Supreme Court found that the trial court had no jurisdiction to alter its nonfinal order after a notice of appeal had been filed. *Id.* at 536 n. 3; *accord Shaw,* 854 P.2d at 1035 n. 6. In the instant case, however, we expressly granted the trial court jurisdiction for the limited purpose of correcting its technical error.

*Preece v. Preece,* 682 P.2d 298, 299 (Utah 1984); *Bagshaw v. Bagshaw,* 788 P.2d 1057, 1060 (Utah App.1990). Accordingly, the 1995 order, which amounted to an order nunc pro tunc to correct a technical deficiency in the 1993 order, related back to the 1993 order. Therefore, Dr. Houston's notice of appeal filed from the 1993 order is sufficient to vest jurisdiction in this court. *See* 6A James W. Moore, *Moore's Federal Practice* ¶ 58.08 (1996) (noting in federal cases dealing with federal Rule 54(b), "it has been held that, absent prejudice, the entry of an order containing a Rule 54(b) certification after the appeal is taken will validate the appeal, without the filing of a second notice of appeal"); *cf.* Utah R.App. P. 4(c) ("Except [for certain exceptions], a notice of appeal filed after the announcement of a decision, judgment, or order but before the entry of the judgment or order of the trial court shall be treated as filed after such entry of and on the day thereof."); *United States v. Hardage,* 982 F.2d 1491, 1495 (10th Cir.1993) (finding federal equivalent of Rule 4 allowed notice of appeal, filed from an improperly certified nonfinal judgment, to "ripen" once judgment had been properly certified).

## Bylaw Immunity

Relying on *Rees v. Intermountain Health Care, Inc.,* 808 P.2d 1069 (Utah 1991), Dr. Houston claims that the Hospital's bylaws do not shield appellees from his contractual due process suit. In *Rees,* an ad hoc committee, concerned with Dr. Rees's surgical complication rates, issued an ultimatum that Dr. Rees could either voluntarily relinquish his cardiac surgical privileges or they would be formally suspended through the due process procedures provided in the hospital bylaws. *Id.* at 1071. Dr. Rees was later informed that his cardiac surgical privileges were suspended. *Id.* at 1071–72. Dr. Rees sued the hospital, claiming it had denied him due process in

suspending his privileges. *Id.* at 1072. The hospital claimed it was immune from suit under both the hospital bylaws and Utah statutory law. *Id.* at 1076.

▪ As the *Rees* court noted, hospital bylaws are "a contract between the hospital and the physician," and the bylaws involved in that case "indicate that the immunity provisions [in the bylaws] are meant to protect the hospital and its personnel from defamation suits or suits arising from *actions taken in the peer review process itself.*" *Id.* at 1076–77 (emphasis added). Accordingly, the *Rees* court concluded that the hospital bylaws did not provide immunity against Dr. Rees's contractual due process claim because the actions against him had not been taken pursuant to the formal peer review procedures described in the bylaws. *Id.* at 1077.

Section 15.41 of the bylaws involved in the instant case reads as follows:

> *For Action Taken:* Neither the hospital nor any representative of the hospital or medical staff shall be liable for damages or other relief for any action taken or statement or recommendation made within the express, implied or reasonable inferable scope of his or its duties, if such acts are made without malice after a reasonable effort under the circumstances to ascertain the truthfulness of the facts and in the reasonable belief that the action, statement or recommendation is warrented [sic] by such facts.

▪ As head of the Surgical Committee, Dr. Snow was authorized to initiate emergency summary suspension under bylaw section 13.81, and was therefore acting within the scope of his duties in initiating the summary suspension.[5] Moreover, Dr. Houston did not allege in his complaint that Dr. Snow or any other appellee acted in bad faith,[6] and even

---

5. Dr. Houston's contention that Dr. Snow was acting as a surrogate for Mr. Dahlquist, who as legal counsel had no authority to suspend surgical privileges, has no merit. Irrespective of whether Dr. Snow acted in accordance with Mr. Dahlquist's advice, the ultimate decision to suspend Dr. Houston's privileges was Dr. Snow's.

6. Dr. Houston's complaint alleged that appellees' improper conduct was "intentional and

outrageous" and accomplished through "gross and inexcusable negligence." *Cf. Dubois v. Grand Cent.,* 872 P.2d 1073, 1079 (Utah App. 1994) (affirming summary judgment against plaintiff suing for slander where plaintiff's claims that defendant "acted hastily and on incorrect information [did] not allude to personal hostility or ill will"). Dr. Houston did not expressly argue that appellees acted with malice

viewing the evidence most favorably to Dr. Houston, it is clear that appellees did not act out of malice. Dr. Houston's practices and complication rates were reviewed a number of times by different professionals, including Dr. Swensen, a disinterested physician from outside the Hospital's staff. The professionals who extensively reviewed Dr. Houston's work were cognizant of balancing the concern for Dr. Houston's interests with the safety of the Hospital's patients and the quality of their care.

In these important respects, the instant case is distinguishable from *Rees*. In that case, Dr. Rees was denied any formal peer review or due process. In this case, however, appellees accorded Dr. Houston extensive peer review and acted, at all times, within the scope of their duties. As a result, appellees are entitled to the immunity from suit provided for in section 15.41 of the bylaws. Therefore, the trial court correctly ruled that, as a matter of law, the bylaws in this case provide appellees contractual immunity from Dr. Houston's suit.

### Compliance With the Bylaws

Although resolution of the bylaw immunity issue technically resolves this appeal, we also address the issue of whether appellees complied with the bylaws in summarily suspending Dr. Houston's surgical privileges. We do so to demonstrate that appellees prevail under either theory.

■ Because the Hospital bylaws constitute "a contract between the hospital and the physician," *Rees*, 808 P.2d at 1076, the Hospital must comply with those bylaws when taking actions which effect its staff. Moreover, we agree with the weight of authority which grants deference to hospital officials' professional judgment. Under this authori-

ty, courts require that a hospital only "substantially comply" with its bylaws. *See, e.g., Owens v. New Britain Gen. Hosp.*, 32 Conn. App. 56, 627 A.2d 1373, 1379–80 (1993), *aff'd*, 229 Conn. 592, 643 A.2d 233 (1994); *Friedman v. Memorial Hosp.*, 523 N.E.2d 252, 253 (Ind.App.1988); *Smith v. Our Lady of the Lake Hosp.*, 639 So.2d 730, 755 (La.1994); *Mahmoodian v. United Hosp. Ctr., Inc.*, 185 W.Va. 59, 404 S.E.2d 750, 755 , *cert. denied*, 502 U.S. 863, 112 S.Ct. 185, 116 L.Ed.2d 146 (1991); *see also Piacitelli v. Southern Utah State College*, 636 P.2d 1063, 1066–67 (Utah 1981) (finding substantial compliance with policies in college personnel manual sufficient to withstand due process attack); *see generally* Kathleen M. Dorr, Annotation, *Exclusion of, or Discrimination Against, Physician or Surgeon by Hospital*, 28 A.L.R. 5th 107, § 3, at 152–67 (1995 & Supp.1996) (collecting cases). Substantial compliance with the bylaws adequately serves their primary purpose, which is to ensure fair procedures for staffing decisions. *See, e.g., Owens*, 627 A.2d at 1379–80.

In this case, Dr. Houston strains to find some technical deficiency in appellees' actions under the bylaws. For instance, he argues (1) minor deficiencies in the minutes of the meetings where his work was discussed violate the bylaws' requirement that minutes be kept at all meetings; (2) he was entitled to, but did not receive, notice of the April 25 meeting; and (3) "immediate action" was not "necessary"—as the bylaws require for summary suspension—because he was on vacation at the time of the suspension and had *no surgeries scheduled and no patients admitted.*

■ The minutes, however, need not be precisely accurate, and the bylaws do not provide that Dr. Houston was entitled to notice of the April 25 meeting.[7] Moreover,

until his motion opposing summary judgment. However, to successfully oppose a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." Utah R. Civ. P. 56(e). Furthermore, the adverse party may not rely merely on factual conclusions. *See Winter v. Northwest Pipeline Corp.*, 820 P.2d 916, 919 (Utah 1991). Dr. Houston did not set forth any evidence

which specifically supports his accusation that appellees acted with malice, and thus, he did not create a sufficient issue of fact with regard to malice to survive summary judgment.

7. Sections 9.13 and 9.30 of the bylaws provide for notice of "staff meetings" for all persons "entitled to be there." Reading these provisions in context shows that they apply only to meetings of the entire medical staff, as opposed to the Surgical Committee. Moreover, Dr. Houston

the information available to appellees at the time—that Dr. Houston's surgical practices were unsafe—reasonably warranted immediate, temporary suspension, for which the bylaws expressly provide. Considering that the well-being of patients may have been at risk, appellees need not have investigated Dr. Houston's itinerary before acting. Shortly after the initial suspension by Dr. Snow, the Surgical Committee further reviewed the situation and altered the suspension to apply to just two types of surgeries. Additionally, in accordance with the bylaws, Dr. Houston was given notice of the Appeal Committee meeting. Thus, the trial court correctly concluded that, as a matter of law, appellees substantially complied with the bylaws in summarily suspending Dr. Houston's surgical privileges.

## CONCLUSION

Because the trial court's 1995 order relates back to the 1993 order, Dr. Houston's notice of appeal, filed from the 1993 order, is sufficient to vest jurisdiction in this court. However, the trial court correctly concluded that the Hospital bylaws make appellees immune from Dr. Houston's suit, as a matter of law. The trial court also correctly concluded that, as a matter of law, appellees substantially complied with the bylaws in summarily suspending Dr. Houston's surgical privileges. Therefore, we affirm the trial court's grant of summary judgment in favor of appellees.

DAVIS, P.J., and JACKSON, J., concur.

[redacted]

does not identify any specific provision in the bylaws that indicates he was "entitled" to be at the April 25 meeting.

Dr. Houston suggests he was entitled to notice of the April 25 meeting under article I, section 7, of the Utah Constitution. However, he fails to cite any relevant authority, fails to make any meaningful argument to support this proposition, and did not preserve the issue before the trial court. We therefore decline to consider it here. *See, e.g., Bunch v. Englehorn,* 906 P.2d 918, 921 (Utah App.1995) (refusing to consider constitutional claim not raised before trial court); *State v. Price,* 827 P.2d 247, 249 & n. 5 (Utah App. 1992) (refusing to consider argument unsupported by legal analysis or authority).