*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 4**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

GABRIEL FINE, M.D.,

*Appellant*,

*v.*

UNIVERSITY OF UTAH SCHOOL OF MEDICINE,
*Appellee.*

No. 20220638
Heard October 18, 2023
Filed February 8, 2024

On Direct Appeal

Third District, Salt Lake County
The Honorable Amy J. Oliver
No. 200900022

Attorneys:

Peter R. Stirba, Shannon K. Zollinger, Salt Lake City, for appellant

Sean D. Reyes, Att'y Gen., Peggy E. Stone, Asst. Solic. Gen.,
Salt Lake City, for appellee

JUSTICE HAGEN authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN,
JUSTICE POHLMAN, and JUDGE LUTHY joined.

Having recused himself, CHIEF JUSTICE DURRANT does not
participate herein; COURT OF APPEALS JUDGE JOHN D. LUTHY sat.

JUSTICE HAGEN, opinion of the Court:

### INTRODUCTION

¶1    Dr. Gabriel Fine is an interventional radiologist and has worked for the University of Utah School of Medicine since 2016. After concerns were raised in 2018 regarding his medical

competence, Dr. Fine agreed to a suspension of his clinical privileges so that the University could conduct an informal review. Following the review, the University recommended that Dr. Fine receive additional training at a separate institution before returning to his interventional radiology practice at the University. Dr. Fine later brought suit, alleging that the University deprived him of his clinical privileges without following the procedures required by its bylaws.

¶2 The University moved for summary judgment, arguing that, per the bylaws, Dr. Fine had agreed not to sue "for any matter relating to appointment, reappointment, clinical privileges, or the individual's qualifications for the same." The district court agreed that Dr. Fine had released his claims against the University, and it granted summary judgment accordingly.

¶3 On appeal, Dr. Fine contends that the district court erred in concluding that the release applied. He does not argue that the release is unenforceable, but only that it is "inapplicable" to his claims. As a matter of contract interpretation, we hold that Dr. Fine's claims against the University fall within the scope of the release and therefore affirm.

## BACKGROUND

¶4 The University hired Dr. Fine as an assistant professor of radiology in February 2016. As part of his employment, Dr. Fine received clinical privileges within the University of Utah Health system, which permitted him to practice interventional radiology subject to hospital bylaws. Most recently, Dr. Fine was reappointed in July 2018, and his clinical privileges were renewed for a two-year period.

¶5 During the months surrounding his reappointment, Dr. Fine's superiors received a number of complaints about his medical care. In August 2018, Dr. Fine met with the hospital's chief medical officer (CMO), who informed him of the "swath of concerns from staff." The particulars of the meeting are somewhat disputed, but Dr. Fine "admits that he agreed to a limited and temporary leave of practice" so that the University could conduct an informal review of his medical competence. Dr. Fine retained his academic appointment during the review, and he was paid accordingly.

¶6 The informal review, which the bylaws call the "Collegial Process," exists to "address questions that arise regarding a [staff] member's clinical practice or behavior" and entails "voluntary, responsive actions where there is a reasonable likelihood that such

steps may correct a pattern/concern before it requires formal investigation." For instance, a staff member may be encouraged to attend "counseling regarding appropriate behavior" or to obtain "additional education" to remedy the issue.

¶7 The Collegial Process is "encouraged, but [is] not mandatory," and the bylaws separately provide that "[w]henever a serious question has been raised, or where [the Collegial Process] ha[s] not resolved an issue" regarding a staff member's medical competence, the matter may be subject to a formal review, which the bylaws refer to as an "Investigation." The bylaws set forth extensive procedural requirements that the University must follow when conducting a formal review. In contrast to the Collegial Process, an adverse ruling following a formal review is reportable to the National Practitioner Data Bank or licensing authorities. Accordingly, Dr. Fine alleges that the CMO gave him "a Hobson's choice of either . . . agreeing [to the Collegial Process] or risking a reportable action."

¶8 Following Dr. Fine's meeting with the CMO, the University retained a third-party specialist to evaluate Dr. Fine's medical competence. After reviewing case files and meeting with Dr. Fine, the specialist noted several concerns related to the care Dr. Fine provided. At the specialist's recommendation, the University informed Dr. Fine that he would need to obtain an additional six to twelve months of training at a separate institution; only then could he return to his interventional radiology practice at the University. Dr. Fine never obtained the recommended training, and, months later, he tendered his resignation. Soon thereafter, Dr. Fine accepted a position in the University's nuclear medicine section, where he remains today.

¶9 Dr. Fine filed suit in January 2020, raising claims for breach of contract and breach of the implied covenant of good faith and fair dealing. He alleged that the University breached its obligations under the bylaws by, "among other things, prohibiting Dr. Fine from providing clinical services to patients while denying his contractual due-process rights." In his view, the University coerced him into giving up his clinical privileges when he was entitled to a formal review and the attendant procedural protections. The University disagreed, contending that requiring Dr. Fine to obtain additional training before he could return to his interventional radiology practice was an appropriate means of addressing the matter under the bylaws. The University added that it remained

willing to restore Dr. Fine's interventional radiology privileges once he completed the additional training.

¶10 The University eventually moved for summary judgment. Aside from arguing that it had sufficiently performed under the bylaws, the University pointed to a provision where Dr. Fine had "released [the University] from any and all liability" and "agree[d] not to sue . . . for any matter relating to appointment, reappointment, clinical privileges, or [his] qualifications for the same." On this point, Dr. Fine argued that the release did "not apply to [his] claims on its face" and, if it did, the protections set forth in the bylaws would amount to "an illusory promise." (Quoting *Peirce v. Peirce*, 2000 UT 7, ¶ 21, 994 P.2d 193 (cleaned up).)

¶11 The district court ruled that the release applied to Dr. Fine's claims and that the University had substantially complied with its obligations under the bylaws. The court accordingly granted summary judgment in favor of the University. Following the court's ruling, the University moved for attorney fees, which the court also granted. Dr. Fine now appeals.

## ISSUE AND STANDARD OF REVIEW

¶12 Dr. Fine appeals the district court's grant of summary judgment in favor of the University. In his view, the court incorrectly concluded that the release applied and that the University was entitled to judgment as a matter of law.[1] "We review a district court's grant of summary judgment for correctness." *Patterson v. State*, 2021 UT 52, ¶ 27, 504 P.3d 92. Summary judgment is appropriate "only when, viewing all facts and reasonable inferences therefrom in the light most favorable to

---

[1] The University also moved for summary judgment on the ground that Dr. Fine's claims were barred by the Health Care Providers Immunity from Liability Act. *See* UTAH CODE §§ 58-13-1 to -5. The Act provides that certain individuals and entities are "immune from liability arising from participation in a review of a health care provider's professional ethics, medical competence, moral turpitude, or substance abuse." *Id.* § 58-13-5(7). The district court agreed with the University in this respect as well and granted summary judgment on the alternative basis that the University had statutory immunity. Dr. Fine also challenges that determination on appeal. But because we affirm the court's determination that Dr. Fine's claims are barred by the release, we need not address whether his claims are also barred by statute.

the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Id.* (cleaned up); *see also* UTAH R. CIV. P. 56(a).

## ANALYSIS

¶13 The district court concluded that the University was entitled to judgment as a matter of law because Dr. Fine's claims were covered by the release. Dr. Fine contends that the court erred in granting summary judgment on this basis because the release "was inapplicable." We conclude that Dr. Fine has not articulated a reasoned basis for reversing the district court's interpretation of the release.

¶14 We interpret the release using our traditional tools of contract interpretation. "The bylaws of the hospital are, in essence, a contract between the hospital and the physician." *Rees v. Intermountain Health Care, Inc.*, 808 P.2d 1069, 1076 (Utah 1991), *abrogated in part on other grounds by Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935 (Utah 1993). As with any other contract, we "look at the plain language . . . to determine the parties' meaning and intent." *In re Western Ins. Co.*, 2022 UT 38, ¶ 35, 521 P.3d 851 (cleaned up). This approach not only "preserves the intent of the parties" but also "protects the contract against judicial revision." *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990).

¶15 Article 1 of the University's bylaws contains a release provision that applies to applicants for "appointment, reappointment, or clinical privileges" and is operative during both "the processing and consideration of the application . . . and throughout the term of any appointment or reappointment." The release provides as follows:

> To the fullest extent permitted by law, the individual releases from any and all liability, extends absolute immunity to, and agrees not to sue the Hospital, Hospital Board, the Medical Staff, their authorized representatives, and appropriate third parties for any matter relating to appointment, reappointment, clinical privileges, or the individual's qualifications for the same. This includes any actions, recommendations, reports, statements, communications, or disclosures involving the individual, which are made, taken, or received by the

Hospital, its authorized agents, or appropriate third parties.

¶16  In this lawsuit, Dr. Fine alleges a breach of contract claim arising from the University's actions "prohibiting Dr. Fine from providing clinical services to patients." On its face, that claim pertains to "any matter relating to . . . clinical privileges," as stated in the release. The terms "any,"[2] "matter,"[3] and "relating to"[4] are exceptionally broad. And Dr. Fine has given us no reason to question that the term "clinical privileges" encompasses the permission to "provid[e] clinical services to patients" that he claims the University unlawfully withheld.

¶17 Nevertheless, Dr. Fine contends that the release "is inapplicable because [his] suit does not challenge his 'appointment, reappointment, clinical privileges or his qualifications for those privileges'—i.e., the [formal] review process itself." In other words, Dr. Fine asserts that the release only applies to the formal review process. Because his claims against the University arise from actions taken during the informal process, he reasons that the release does not bar his claims. But Dr. Fine never engages with the contractual language to show how it supports his initial assumption that the release only applies to actions taken in connection with a formal review.

¶18 We see no textual justification for limiting the release's application to actions taken during the formal review process. The release never mentions the review process—formal or informal— or any of the other procedures for addressing competency concerns, all of which are set forth in Article 5 of the bylaws. The

---

[2]  *Any*,  MERRIAM-WEBSTER,  https://www.merriam-webster.com/dictionary/any (last visited Jan. 23, 2024) ("1. [O]ne or some indiscriminately of whatever kind . . . .").

[3]  *Matter*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. A subject under consideration, esp. involving a dispute or litigation; . . . 2. Something that is to be tried or proved; an allegation forming the basis of a claim or defense . . . 3. Any physical or tangible expression of a thought.").

[4]  *Relate to*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/relate%20to (last visited Jan. 23, 2024) (4. "[T]o be connected with . . . or to be about (someone or something).").

release appears in Article 1, which addresses applications for clinical privileges. And the language immediately preceding the release states that it applies not only to the initial application process, but also "throughout the term of any appointment or reappointment." This broad language, which makes the release applicable at all stages of an individual's appointment, refutes the argument that the release applies only when that individual is subject to a formal review.

¶19 Dr. Fine does not undertake any analysis of the contractual language to explain how it supports his interpretation that the release only covers actions taken during the formal review process. When arguing that the district court misinterpreted a contract, an appellant cannot "meet its burden of persuasion with general arguments rather than an analysis of the key contractual language." *2010-1 RADC/CADC Venture, LLC v. Dos Lagos, LLC*, 2017 UT 29, ¶ 32, 408 P.3d 313. Here, Dr. Fine does not engage in any plain language analysis of the release itself, nor does he direct us to any other provision of the contract which, when read together, suggests that the release is as limited as he asserts.

¶20 Rather than analyzing the contractual language at issue, Dr. Fine directs us to *Rees v. Intermountain Health Care, Inc.*, a similar case in which a doctor sued a hospital, alleging that it had revoked his elective surgery privileges without affording him the procedural protections guaranteed by the hospital's bylaws. 808 P.2d at 1071–72. After Dr. Rees prevailed at trial, the hospital appealed, arguing that the district court should have granted its motion for summary judgment because the release in its bylaws barred Dr. Rees's suit. *Id.* at 1072, 1076. We rejected that argument, in part, because the revocation of Dr. Rees's privileges had occurred during a meeting that "was not a peer review hearing within the description and designation contained in the bylaws." *Id.* at 1077. Dr. Fine asserts that "[l]ikewise, the suspension of [his] clinical privileges extracted in the . . . meeting with [the CMO] was not a peer review hearing."[5] And because the release in *Rees* did not apply to Dr. Rees's claims, Dr. Fine argues that the release here is similarly inapplicable to his claims.

---

[5] The term "peer review" is mentioned only once in the bylaws—in the section describing the informal Collegial Process. But we understand that by "peer review" Dr. Fine means the formal review process identified in the bylaws as an "Investigation."

¶21 The district court rejected that argument because it concluded that, unlike in *Rees*, "Dr. Fine was afforded peer review via the collegial process and did not have any privileges revoked without his consent." The court also determined that "[t]he University acted in good faith and in compliance with its Bylaws" like the hospital in *Don Houston, M.D., Inc. v. Intermountain Health Care, Inc.*, 933 P.2d 403 (Utah Ct. App. 1997).[6] On appeal, Dr. Fine asserts that the district court erred in both determinations.

¶22 We do not reach the question of whether this case is distinguishable from *Rees* on the grounds articulated by the district court because a more fundamental distinction is apparent from the record.[7] The release in this case does not contain the same language

---

[6] The court cited *Don Houston* for the proposition that "[w]here a hospital acts in good faith and substantially complies with its bylaws, it is immune from suit under" the release. (Citing 933 P.2d 403, 406–08 (Utah Ct. App. 1997).) Both parties likewise assume that *Don Houston* treated substantial compliance with the bylaws as a prerequisite to the University invoking the release. This is an incorrect reading of *Don Houston*. The *Don Houston* court affirmed on two separate grounds: (1) the surgeon's claims were barred by a release in the hospital's bylaws, *see id.* at 407–08; and (2) based on the undisputed facts, the hospital had suspended the surgeon's privileges in substantial compliance with its bylaws, *see id.* at 408–09. The court of appeals made clear that substantial compliance was an alternative ground for affirmance that was unnecessary to reach once the court determined that the suit was barred by the release. *See id.* at 408 ("Although resolution of the bylaw immunity issue technically resolves this appeal, we also address the issue of whether [the hospital] complied with the bylaws . . . ."). In other words, substantial compliance went to the merits of the claim, not to whether the release barred the suit. Thus, in determining whether Dr. Fine's claims fell within the scope of the release, there was no need for the district court to consider whether the hospital substantially complied with its bylaws.

[7] "It is well settled that an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record . . . ." *Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 (cleaned up). This is true "even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action," and even if "such ground or theory is

(continued . . .)

as the release in *Rees*. In *Rees*, we interpreted the release at issue to mean that "the hospital and its personnel [were immune] from defamation suits or suits arising from actions taken in the peer review process itself." 808 P.2d at 1076–77. Because the release only barred those two types of claims and Dr. Rees's suit was not a defamation action, we proceeded to consider whether the suit arose "from actions taken in the peer review process itself." *Id.* at 1077. And we concluded, based on the evidence at trial, that the meeting at which Dr. Rees's privileges were revoked "was not a peer review hearing" and therefore the release did not apply. *Id.*

¶23  *Rees* does not stand for the proposition that all releases in hospital bylaws—however worded—are limited to claims arising from the peer review process. In holding that the release "in the hospital bylaws did not prevent Dr. Rees's suit for denial of due process in contravention of the bylaws," we were not stating a generally applicable principle of law but interpreting the specific contractual language before us. *Id.* As a result, that holding is of limited precedential value unless a court is interpreting an identical or substantively equivalent release. Here, because Dr. Fine has undertaken no comparison of the two sets of bylaws, he has not persuaded us that the holding in *Rees* is relevant, much less controlling.

¶24  Finally, Dr. Fine asserts that the release "presupposes that the University has, in fact, followed its contractual procedures relating to any action taken with respect to clinical privileges." To support that argument, Dr. Fine directs us to a provision in the same section as the release that states, "The individual agrees that the hearing and appeal procedures set forth in [the bylaws] shall be the sole and exclusive remedy with respect to any professional review action taken by the [University]." But Dr. Fine does not explain how that provision narrows the scope of the release.[8]

---

not urged or argued on appeal by appellee, was not raised in the lower court, and was not considered or passed on by the lower court." *Id.* (cleaned up).

[8]  Dr. Fine has not invoked the first breach rule, which might turn on whether the contractual procedures and the release are mutually dependent provisions. *See Larson v. Stauffer*, 2022 UT App 108, ¶ 26, 518 P.3d 175 ("The first breach rule provides that when one party materially breaches a provision of a contract, the other

(continued . . .)

Because, on its face, the release applies to Dr. Fine's claims, we affirm the district court's ruling granting summary judgment for the University.

## CONCLUSION

¶25 Dr. Fine provides no basis for rejecting the district court's determination that his claims are barred by the terms of the release, which prohibit suit for "any matter relating to appointment, reappointment, clinical privileges, or [his] qualifications for the same." Dr. Fine, therefore, fails to show that the court erred in granting summary judgment to the University. We affirm and remand so that the district court can calculate an award of attorney fees incurred on appeal.[9]

---

party's subsequent failure to perform a specific obligation is excused if the promises are mutually dependent." (cleaned up)). Nor has he advanced any other argument on appeal relating to the enforceability of the release. Dr. Fine did argue below that if the release was as broad as the University contended, the bylaws would present an "illusory promise," but he abandoned that argument on appeal.

[9] The University requests attorney fees on appeal because the district court awarded them below under the reciprocal fee statute and an attorney fee provision set forth in the bylaws. *See* UTAH CODE § 78B-5-826. Dr. Fine contests this award only to the extent the court erred in concluding that the University was entitled to summary judgment and was, therefore, the prevailing party. Because Dr. Fine has not established error, we agree that the University is entitled to attorney fees incurred on appeal. *See Jordan Constr., Inc. v. Fed. Nat'l Mortg. Ass'n*, 2017 UT 28, ¶ 71, 408 P.3d 296 ("When a party is entitled to attorney fees below and prevails on appeal, that party is also entitled to fees reasonably incurred on appeal." (cleaned up)).